THE UNITED ELECTRIC LIGHT AND POWER COM-PANY *vs.* THE STATE OF MARYLAND, For the Use of BARBARA LUSBY et al.

*Negligence—Death Caused by a Broken Telephone Wire Charged From an Electric Light Wire—Evidence.*

A man was found dead about three o'clock on a winter morning lying upon the sidewalk of a street with a bare copper telephone wire wrapped around his body and the wire charged with a deadly current of electricity. No one saw the accident when it occurred. On a pole overhead were strung, thirty-five feet above the ground, certain feed wires of the defendant Electric Light Company and also a wire of a telephone company. This latter wire broke, fell across the electric light wire and reached the ground. The night of the accident was damp and rainy. At the point where the telephone wire came in contact with the feed wire and became charged, the insulation of the former wire was abraded but not burned entirely through. Only a short time had elapsed between the breaking of the telephone wire and the fatal injury to the deceased by his coming in contact with it as it hung down. There was no evidence that the insulation of defendant's wires was not of the best kind except at certain other places, or that proper inspection thereof was not made, or that defendant had notice of the broken wire or could have discovered it in time to prevent the accident. *Held*, that there is no evidence to show that any negligence on the part of the defendant

Electric Light Company caused the injury, and that therefore in an action to recover damages for the death so occasioned the case should not be submitted to the jury.

In an action to recover damages for a death caused by the deceased coming in contact with a telephone wire which had been charged with electricity by being broken and falling across the feed wires of the defendant Electric Light Company evidence is not admissible to show that the insulation of defendant's wires was defective at other points or on other occasions.

In an action to recover damages for the death occasioned by negligence evidence as to the earning capacity of the deceased is admissible.

The hypothetical question put to an expert witness should embrace no facts except those of which evidence in the case have been given.

Appeal from the Baltimore City Court (HARLAN, C. J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Defendant's 1st Prayer.*—That there is no evidence in this case legally sufficient to show that this defendant was guilty of any negligence by reason of either the breakage of the telephone wire mentioned in the evidence or by reason of said wires remaining broken and suspended as mentioned in the evidence from the time of the breakage until the time of the accident. (*Refused.*)

*Defendant's 2nd Prayer.*—That if the jury shall find that the accident complained of was caused by a broken wire, not the property of this company, falling across and rubbing against a feed wire of this company, and that said feed wire was strung properly high above the street, and shall further find that this defendant had no actual notice of the presence of this broken wire, and that the accident occurred a few minutes or within a-half hour of the time the broken wire became so placed, then their verdict must be for this defendant now, though they shall further find that the electric current passed through the insulation of said feed wire to the broken wire and thence to the body of the deceased. (*Refused.*)

*Defendant's 3rd Prayer.*—That if they shall find that the feed wire in question was of the best make and covered with

the best known weather proof insulation, and strung high above the street bed, that it had been in service about seven or eight years and that the life of the wire was fifteen years, and that without any fault on the part of this company the broken telephone wire rested upon said feed wire, and through the weather conditions then existing the feed wire had become wet and the electric current passed through the dampness to the telephone wire, then their verdict should be for this defendant, there being no evidence in this case that this defendant knew of or could have discovered the contact of said wires in time to have avoided the accident. (*Refused.*)

*Defendant's 4th Prayer.*—If the jury shall find from all the evidence in the case that this defendant used the best material in the construction and stringing of its wires, at the place and time of the accident and that the material so used known as weather-proof insulation will under the effect of rain become moist and the moisture then absorbed became a conductor of electrical current to any substance pressing upon it, and under these conditions, if they shall so find, the broken wire fell across the feeder in question and the electrical current passed through the moisture to the broken wire, without any notice to this defendant or opportunity to know the situation then the resulting accident therefrom was one against which this defendant could not guard and their verdict must be for this defendant. (*Refused.*)

*Defendant's 5th Prayer.*—That unless the jury shall affirmatively find from the evidence that the wire with which the deceased, Lusby, came in contact had become broken and suspended in a dangerous condition through some act of negligence on the part of this defendant or that said wire after becoming so broken and suspended was with the knowledge of this defendant permitted to remain in such dangerous condition for a period of time so long that the jury shall be satisfied that this defendant in fact should have known of such breakage, suspension and dangerous condition in time to have removed said wire before the deceased came in contact therewith, then their verdict should be for this defendant, even

though the jury shall further find that said wire had become dangerous from the electric current contained in feed wire of this defendant with which said broken and suspended wire had reason of its breakage come in contact. (*Refused.*)

*Defendant's 7th Prayer.*—This defendant is not an insurer of the absolute safety of its wires, and if the jury shall find that without notice to this defendant and without fault on its part, a broken wire not the property of this defendant fell across and became suspended from one of the feed wires of this defendant upon a wet, rainy night, which said feed wire was strung some thirty feet above the ground and out of the way of pedestrians or others using the street or pavement below, and which said feed wire was covered by the best known weather proof insulation and that there was no outward indication that said feed wire was not in proper condition, and shall further find that the deceased while lawfully upon the highway became entangled in the wire so suspended and received an electrical current causing his death, but that there had been no prior notice to this defendant, of the conditions then existing, or reasonable opportunity of ascertaining the same, then this verdict must be for this defendant, even though they shall further find that the death of the deceased was in fact caused, without fault on his own part, by an electric current which passed from the feed wire of the defendant through its insulation to the broken wire above mentioned and through said broken wire into the body of the said deceased. (*Granted.*)

*Defendant's 8th Prayer.*—That while this defendant was legally bound to erect and maintain their electric wires in such condition, so far as it was able to do so in the conduct of its business as not to endanger the public, and was in so erecting and maintaining its said wires legally bound to keep their said wires out of contact with or dangerous proximity to other wires with which the public might be liable to come in contact, this defendant was not legally bound to care for or maintain in its proper position the telephone wire of the Chesapeake and Potomac Telephone Company mentioned in the evidence

or to anticipate or to provide against any breakage thereof, and if the jury shall find that prior to the breakage of said telephone wire the electric wires of this defendant at and about the place of the accident were in a condition of safety as far as the public was concerned, then their verdict must be for this defendant, there being no evidence in the case legally sufficient to show that after said breakage this defendant had had any knowledge thereof or any opportunity to remove said broken wire from the position of danger to the public. (*Refused.*)

*Edgar H. Gans* and *C. Baker Clotworthy* (with whom was *J. Southgate Lemmon* on the brief), for the appellant.

The testimony which was undisputed showed that there was a large wooden pole at the southeast corner of Fremont and Portland streets, the property of the appellant, upon which were wooden cross arms supporting a line of electric light feed wires running north and south on Fremont street. That these wires were insulated wires carrying a current of about 2,000 volts, and were strung about thirty-five feet above the sidewalk. But from this pole there also extended a brace or arm supporting an electric light over the center of Fremont street. On the night in question this electric light was burning brightly.

The broken telephone wire which caused the accident extended from the pole of the appellant at the southeast corner of Portland and Fremont streets diagonally across Fremont street in a southwesterly direction to a pole situate some distance south of Portland street and from thence to the shops of a telephone subscriber.

In some way, of which no explanation is given in the testimony, this bare copper telephone wire became broken or was broken during the night of November 25th, 1902. There is no evidence in this case as to whether the wire was maliciously and wantonly broken, or broken through some inherent defect or other cause, the fact alone being before Court and jury that the telephone wire, after the accident, hung down from the

pole across and in contact with one of the feed wires of the appellant.  As no one saw the wire prior to the accident, it cannot be stated whether the broken end of the wire actually rested upon the ground or whether the unfortunate accident was concurrent with the breaking of the wire, and the wire in breaking fell upon the deceased, but the testimony of Ricktor, that the wire was wrapped around the body of Lusby lying upon the ground, justifies the conclusion that if the wire was in fact broken and hanging down at the time Lusby reached the corner that then the broken end rested upon the wet sidewalk or street, and if in contact with feed wire made what the electricians call a perfect ground, having the combination of the water from the rain and the earth.

How or why the wire broke cannot be stated, but the fact is shown by the witnesses of the plaintiff that it was broken but a short while before the happening of the accident.  Ricktor, the policeman, had been on the corner only fifteen minutes before and saw no wire down; the night inspector of the appellant had passed the corner on his bicycle about a quarter of three and saw nothing wrong, and Cavanaugh, the employee of the Chesapeake and Potomac Telephone Company, returning from a trouble call, passed the corner about two o'clock and saw no trouble.  All three of these witnesses were men trained to observe the condition of wires, and it is therefore safe to assume that had the wire been down one of the three, at least, would have observed it, especially so when we bear in mind there was an electric light swung from the pole and burning brightly.

There is no evidence in the case as to how the deceased became entangled in the wire or how the wire became wrapped around his body as testified to by the witness, Ricktor, and we have only the bare fact that the body was found upon the sidewalk with the telephone wire wrapped around it and the current from the electric light wire passing through the body. The testimony showed that at the point where the telephone wire bore down upon the electric light wire that the insulation on the latter wire was not burned through, but had a notch

burned in it for the space of half an inch at that point, that otherwise the insulation of the wire seemed to be in good condition.

How and why the wire broke, whether from inherent defect or by the force of a trespasser; with what force it fell across the feed wire; how it passed from its diagonal position southwesterly from the pole to hanging perpendicular to the pole; whether others passing that corner had come in contact with it or not prior to Lusby; what force, if any, Lusby applied to it when he became entangled in it, are all questions which should have been answered, and the facts presented to the expert hypothetically before an opinion was given as to whether the insultation of this particular wire should have withstood the attack made upon it.

There was no evidence in the case which justified the assumption of the question that the telephone wire simply fell across the feed wire and simultaneously wrapped itself around the body of the deceased. Common experience teaches that to extricate oneself from a tangled wire is not the work of an instant, and no one can ever know how much of a struggle Lusby made before the electric current became communicated to the wire. If he tripped over the wire in crossing the street, which is quite probable; and carried it with him in his fall upon the sidewalk, it is quite evident that nearly the whole weight of his body must have been upon the telephone wire dragging it with great force upon the electric light wire. A force which might very well have cut into the insulation of the electric light wire under the wet conditions then existing.

The question in each of the fourth, fifth and sixth exceptions was faulty in form. The witness was asked whether it certain things happened, the insulation was "proper" or the wire was "properly" insulated. The word is susceptible of so many meanings that it might mislead witness in his answe The question of fact at issue was one of negligence and the the insulation might have been the best obtainable an insulate best possible condition the best obtainable might not of the perfectly at all times and in all weathers. The fact of

death and of the wire causing the death, would raise a legal presumption of negligence if the defendant be held in law an insurer, but the witness was examined upon the theory that the plaintiff should prove negligence and prove it by the condition of the wire. The plaintiff therefore should have asked whether it was reasonably practicable for the defendant to have provided a feed wire so insulated as to have stood the strain and conditions to which their wires were exposed with safety to the public. As an expert he might have given evidence as to this upon which his testimony could be tested, but no one can understand the standard of "properly" used by another, and insulation that might be improper in the scientific sense might be the best obtainable and most proper for use in a practical sense. The question was therefore misleading in form and the answer was consequently without certainty. The criterion was not whether the insulation used was proper, but whether it was the best obtainable.

At the close of the plaintiff's case, the trial Court granted a prayer instructing the jury that there was no legally sufficient evidence of any failure on the part of the Chesapeake & Potomac Telephone Co.—the co-defendant—to perform any duty owed to the deceased and that the verdict must be for that defendant. At the same time the Court refused a similar prayer offered by the appellant.

The only theory upon which the Court could have made such a ruling, was that this was a case where the doctrine of *res ipsa loquitur* applied, and that in the opinion of the Court it applied only to the appellant and not to its co-defendant. In the opinion of the appellant, even if the doctrine did apply, the distinction could not be maintained.

If there was any presumption raised against the appellant by reason of the insulation of its wire, notwithstanding the force applied to it and the attack made upon it, we respectfully submit that there was also a presumption against the Telephone Company to explain why its wire was broken and hanging across the feed wire. As said in a New York case, where a span wire of a trolley wire broke and fell across an

electric light wire, and the doctrine of *res ipsa loquitur* was invoked; "the *res* in this case was not the electric current, but the breaking of the defendant's wire. It was the wire that inflicted the injury. No matter how intense the electric current, had the wire not broken and fallen on the plaintiff no injury could have happened." *Jones* v. *Union Ry. Co.*, 18 N. Y. App. Div. 267.

When the appellant opened its defense, there having been no proof of any affirmative act of negligence and no proof of the breach of any duty to the deceased, it was only called upon, to rebut the presumption raised against it by the mere circumstance of Lusby having been killed by an electric current under the circumstance narrated in the evidence.

The measure of the appellant's duty in regard to wires strung high is, quite different from the measure of its duty in regard to wires so placed that persons in lawful pursuit of their various occupations might come in contact with them. *Brown* v. *Edison Electric Company*, 90 Md. 406.

If we apply the reason of the Court in *Brown's case* for the duty imposed with regard to the wires, to wit, that persons might come in contact with them, to the case at bar, would not that duty be modified by the fact that the wires of the appellant were so placed that persons in the ordinary use of the highways would not come in contact with them. *McLaughlin* v. *Louisville Elec. Light Co.*, 37 S. W. Rep. 851; *Cumberland* v. *Lottig*, 95 Md. 48. And should not that duty also be modified by the fact that because the wires were placed in an inaccessible place, to wit, strung from poles thirty-five feet above the street, that they could not in reason be inspected, except from the ground, and the company only held responsible for defects so apparent or of which it had notice.

It seems to us that the measure of the duty should be no greater than the measure of the apparent danger, and that when the measure of the apparent danger has been met by placing the wires in such a position that no one except those skilled in the handling thereof can come in contact therewith, that then the measure of the duty has been fulfilled, and in

the event of damage or injury from an intervening cause, such as the breaking of another wire not the property of the defendant, as in this case, no presumption should arise, but the duty rests upon the plaintiff as in ordinary cases to show that the defendant by the exercise of proper care under the circumstances could have guarded against the changed condition, or that the defendant knew of the changed condition, or by reason of lapse of time should have known.

Certainly it would seem but reasonable and proper that where through the breaking of the property of another the defendant's property causes or contributes to the injury resulting therefrom, that the plaintiff should be required to affirmatively show that the defendant by the exercise of proper care under the circumstances could have guarded against the consequences of the accident.   In the case at bar there was absolutely no evidence that the wires of the defendant were not proper for the use to which they were put, or were not, so far as they could be observed, in good condition.   Nor was there any evidence in the case that the insulation of an ordinary feed wire used for the purpose of distributing electricity in the ordinary course of business and subject to climatic changes in the city of Baltimore, could be expected to withstand, under the conditions existing on the night in question, the effect of the telephone wire being drawn against it.   To add to the absence of such facts the further fact that the accident resulted from an intervening cause, beyond the defendant's control, would certainly preclude any presumption arising.

In *W. U. Telegraph Co.* v. *State, use of Nelson*, 82 Md. 293, there was the element of notice to the railway company of the changed condition, in that the telegraph wire being across its feed wire for a period of at least two weeks, and the changed condition making a new and dangerous situation, the wire should have been removed.

An electric light company that has erected its wires in city streets with the consent of the proper authorities, is not an absolute insurer against accident therefrom, and that it is only bound to exercise care and diligence in the erection and main-

tenance of the system proportionate to the danger, and when it has fulfilled this obligation it has discharged its entire duty and its liability ceases.   *Denver Electric Co.* v. *Simpson*, 21 Colo. 371; *Boyd* v. *Portland Elec. Co.*, 37 Org. 567; *Nugent's case*, 86 Md. 349; *Brown's case*, 90 Md. 401; *Nelson's case*, 82 Md. 293; *Abbott's case*, 75 Md. 152.

If a presumption was raised against the appellant, it arose from the one fact that the insulation of its feed wire failed to withstand the attack made upon it by the telephone wire at the time of the accident.   To rebut this and show that no insulation known to commercial uses could have withstood such an attack, the plaintiff offered the testimony of William Russell, the superintendent of the overhead lines of the appellant, and a man whom the testimony showed, had been actively connected with the erection, construction and supervision of overhead electric wires since the introduction of the first electric light company in the city of Baltimore, thus covering a period of twenty-two or twenty-three years.   This witness testified that he was familiar with the wiring used by the appellant; and that it was called weather-proof line wire and was the same used, as far as he knew, all over the country for outdoor work.   That the appellant bought the best known make of weather-proof wiring.   That he was familiar with the particular wire in question, and that it was the best weather-proof wire.   That he was superintendent of the company when the wire was put up, and that it had been put up about six years. That the life of such a wire was about 15 or 16 years.   That he made an inspection of the wire in question after the accident, and that, as far as he could see, as an experienced lineman, the electric light wire was in good condition.   The witness being asked as to the effect of wet or moisture upon the insulation, stated that when the insulation was wet it was not much of an insulator, and that the current would go through it if there was a good ground or contact.   That the same insulation would withstand when dry what it would not withstand if wet.   That an insulation that would withstand a thousand volts in wet weather would withstand five thousand or

probably ten thousand volts in dry weather. That the water which gets into the insulation is the conductor and through this the current escapes, and that the current could thus escape without the insulation being burned through or worn off. That under the same conditions when the insulation became dry again no current would escape. That moisture and varying weather conditions effected the insulation. When dry it would withstand; when wet it would not.

That in his experience as a lineman he had used wires with paraffine insulation and wires covered with rubber and tape wrapped around the rubber. That the paraffine covered wire lasted but a very short while, and that owing to heat and changes of temperature the rubber covered wire would crack and bag down and finally fall off. That he had to replace both of these kinds of wire with the weather-proof wire, such as the particular wire in this case. At the conclusion of the witness' examination in chief, he was asked whether or not, in his opinion, and in view of his experience with insulated overhead wires, if there was any insulation known that would stand the climatic changes of the city of Baltimore, to which he replied that there was nothing to his knowledge that would withstand it; that he had never seen or heard of any that would. Other witnesses testified to the same effect.

There was absolutely no evidence in this case as to what means, if any, other than those employed by the appellant, could have been used to avoid the accident, nor was there any testimony that any other kind of wire would have withstood the test to which this wire was subjected. In the absence of such proof the case should not have been allowed to go to the jury. *Abbott's case*, 75 Md. 152.

The full measure of the appellant's duty having been shown to have been performed, the presumption from the mere fact of the accident must fail, and the first prayer of the appellant offered at the close of the whole cause should have been granted. *W. U. Tel. Co.* v. *State, use of Nelson*, 82 Md. 293, 312; *City Pass. Ry. Co.* v. *Nugent*, 86 Md. 349–358; *Denver Elec. Co.* v. *Simpson*, 21, Colo. 371–373; *Boyd* v. *Portland*

*Elec. Co.*, 37 Ore. 567–573; *Block* v. *Milwaukee St. Ry. Co.*, 27 L. R. A. 365–368.

On the whole case therefore we submit, the affirmative testimony shows:

*First.* That the wires of the defendant were of the best known make for the uses to which they were put, and the same as used in all the large eastern cities.

*Second.* That the wires were strung high above the sidewalk and street so that persons in the ordinary pursuit of their business or occupations would not come in contact with them.

*Third.* That the defendant was not responsible for the breaking and falling of the telephone wire.

*Fourth.* That the defendant had no notice of the changed conditions caused by the broken telephone wire, nor was there any such lapse of time between the breaking of the wire and the happening of the accident to put the defendant upon notice of the changed conditions.

*Fifth.* That no insulation known to science or commerce could withstand the climatic changes of the city of Baltimore. That when wet the insulation would not prevent the electric current from escaping to a wire in contact therewith and grounded.

*Sixth.* That the night of the accident was a damp and rainy night.

*Seventh.* That the defendant maintained a complete system for the inspection of its wires according to the possibilities of the structure, and a crew ready night and day to make repairs and prevent dangerous conditions remaining.

This then was the direct and affirmative evidence in the case, and it showed that the defendant, having regard for the dangerous element it was using, fulfilled the duty cast upon it by law.

The plaintiff did not controvert this testimony and utterly failed to show:

*First.* What other or different kind of wire the defendant could have used that would have prevented the accident.

*Second.* That the flaring in the trees existed on the night in question or in any way contributed to the accident.

*Third.* That the defendant was responsible for the breaking of the telephone wire; and,

*Fourth.* Or any affirmative act of negligence on the part of the defendant directly contributing to the accident.

*J. Cookman Boyd* (with whom was *Charles R. Schirm* on the brief), for the appellee.

Lusby's body was burned around the neck and diagonally across the left hand; and there was one wrap of the wire around his neck, one around his left hand and probably another around the feet.   It had been raining off and on all that night, a kind of misty rain, and Lusby carried an open umbrella which was clutched in his left hand, his head lying in it, at the time his body was found.   The wire which was wrapped around his body was a bare copper telephone wire strung from the pole of the defendant, the United Electric Light and Power Company, and was lying across one of the United Electric Light and Power Company's high tension feed wires that ran down on the east side of Fremont street.   The wire had been strung since 1894 through a row of trees on Fremont street, and because of contact with their branches and exposure to the weather, the insulation of same had become absolutely defective.   When erected it was used to carry a thousand volts but after consolidation of the companies it was used to carry 2,000 volts.   The death of Lusby was occasioned by his contact with the bare copper wire which had become charged with electricity from this high tension feed wire of the Electric Light Company.   Lusby was a robust, healthy man, twenty-six years of age, and weighed about one hundred and eighty pounds, and at the time of his death was receiving a salary of fourteen dollars per week.   He left a wife, Barbara Lusby, and an infant child, Henry I. Lusby.

The testimony disclosed that Lusby, without fault on his part, was killed by contact with a wire which crossed a defectively insulated feed wire of the defendant company and thus became charged, and that the defective condition of the insulation was known to the defendant company, or by the

exercise of ordinary care on its part, could have been known. The appellant's liability would seem to be beyond question. *W. U. Tel. Cor.* v. *Nelson* 82 Md. 293; 31 L. R. A., p. 572, note.

Webster, a witness for the plaintiff, testified that at or immediately prior to the night of the accident he had seen a flame at 305 and 315 Fremont street as a result of the wires running on the east side of Fremont south from Portland street coming in contact with the trees on the east side of the street. This testimony is simply corroborative in part of that of other witnesses as to the burning.

Lotz, who resided nearby, had occasion to observe this particular wire and stated that it had ignited trees on several occasions and it would burn for an hour or two at a time at different intervals, not right straight along but just at times. The Court asked witness "what is the kind of burning you saw in the trees," and he replied "just the trees ignite, a little flame in the *top* of the trees or leaves."

All the witnesses agree that the arcing or burning occurred in the *top* of the trees where the Electric Light Company's wires were and *not lower down.* Taken in connection with the testimony of the expert, Keilholtz, can there be any doubt that the wires of the defendant, including the particular feed wire mentioned, were defectively insulated at these trees and that the burning was occasioned thereby?

We submit that the uncontradicted testimony shows that the arcing or burning was occasioned by the appellant's wires and that it was rightly permitted to go to the jury, and the motion to strike out properly overruled. *Storr* v. *James*, 84 Md. 288.

Even if this particular wire had not been specifically designated the testimony as to the general condition of appellant's wires at or near the place of the accident of which this was one, as indicated by the arcing in the trees, was admissible. *Gillett on Indirect and Collateral Evidence*, sec. 62.

BRISCOE, J., delivered the opinion of the Court.

This suit was brought on the 2nd day of December, 1902,

in the Baltimore City, Court, in the name of the State for the use of Barbara Lusby, widow, and Henry I. Lusby, infant child, against the appellant and the Chesapeake and Potomac Telephone Company of Baltimore City, to recover damages for the death of Harry H. Lusby, husband and father of the equitable plaintiffs, which is alleged to have been caused by contact with an electric wire charged with electricity at the corner of Fremont avenue and Portland street, Baltimore.

The declaration states that his death was occasioned by the negligence of the defendant in permitting a wire of the Chesapeake and Potomac Telephone Co. to break and come in contact with one of the feed wires of the United Electric Light and Power Company, the latter wire being improperly and defectively insulated and heavily charged with electricity. And that the defendants were negligent in permitting the wires to become and remain in a condition dangerous to the lives of persons lawfully using the highways of Baltimore, by reason of which default, wrongful act and negligence of the defendants, the equitable plaintiffs have lost the services, society and companionship of their husband and father, and sustained great injury and damage.

On the 8th of June, 1904, there was a verdict in favor of the Chesapeake and Potomac Telephone Company under the instructions of the Court.

On the 10th of June of the same year, there was a verdict in favor of the plaintiff, against the United Electric Light and Power Company the appellant here for nine thousand dollars, divided as follows: six thousand dollars to Barbara Lusby, widow, and three thousand dollars to Henry Lusby, infant, and from a judgment thereon the defendant has appealed.

The record contains thirteen exceptions, twelve of which relate to the admissibility of testimony offered during the trial and the thirteenth was taken to the action of the Court in refusing to grant the appellant's first, first a, second, third, fourth, fifth, eighth and eleventh prayers.

It will not be necessary, however for us to consider in detail all of the exceptions to the testimony offered because some of them can be considered together.

It appears that the accident in this case happened on the twenty-sixth day of November, 1902, about 3 o'clock in the morning at the corner of Fremont and Portland streets, Baltimore. No one saw the accident, but the body was found lying on the sidewalk, face downwards and pointing towards the east and about four or five feet from the curbstone on Fremont street; a copper telephone wire was wrapped around the body and he was burned around the neck and left hand. The wire was charged with electricity coming from a feed wire of the appellant company strung some thirty-five feet above the sidewalk. It appears from the testimony that death was occasioned by contact with the telephone wire which had become charged with electricity by falling across the feed wire of the appellant company. The telephone wire was found across and in contact with the insulated feed wire of the appellant company.

We do not think that the facts of this case as disclosed by the record furnish any ground for the conclusion that the death of the deceased was caused by the negligence of the appellant company. There is a failure of evidence to establish negligence on the part of the company and there is no evidence to show a failure on its part to perform any duty that it owed to the deceased.

The first, third, seventh, tenth, eleventh and twelfth exceptions to the admission of evidence are substantially the same and can be considered together. It was error, we think, to have admitted the testimony set out in these exceptions. The effect of the testimony as introduced, was to show that the insulation of certain of the defendants wires was defective at other points and on other occasions than at the point of contact where the accident happened. There was manifestly no connection between the alleged defects and the injury here complained of. The death of the deceased was not caused by the burnings of the wires at other points or on other occasions, but was caused by contact with a telephone wire that had crossed a feed wire of the appellant company on the night of the accident. The testimony therefore was too remote and

misleading and presented an issue of negligence not involved in the case. There was also a want of identification of the wires. There was no proof that the flaring in the trees came from the wire which the telephone wire crossed.

There was no error in the ruling of the Court on the second exception as it was competent for the jury to consider the earning capacity of the deceased and the testimony therein admitted tended to establish this fact.

The fourth, fifth and sixth exceptions are practically the same and relate to questions put to the expert witness, Lindsay. The questions embraced in these exceptions, we think were improper, and did not state the necessary facts upon which an expert could base an opinion. They also assumed facts that had not been proven in the case. The objections to these questions should have been sustained.

The eighth exception relates to the refusal of the Court to allow the witness, Russell, to testify to the result of an experiment with a piece of insulated feed wire supposed to be similar to the feed wire in question. The witness was not called as an expert, and stated that he did not testify as an expert on the manufacture of insulation or the manufacture of wire. The experiment made by him was entirely too uncertain and misleading to have been submitted to the jury as a test of the resisting qualities of insulation when wet or dry.

There was no error in the ruling of the Court in the ninth exception in refusing to admit as evidence, a letter press copy of the record sent to Washington of the general condition of the weather in Baltimore on November 25th and 26th, 1902.

This brings us to a consideration of the rulings upon the prayers, which are embraced in the thirteenth exception. The defendant's first prayer which instructed the jury that under the pleadings there is no evidence in this case legally sufficient to entitle the plaintiff to recover, should have been granted and the case withdrawn from the jury.

In *City Pass. Ry. Co.* v. *Nugent*, 86 Md. 357, it is distinctly said, if there be no negligence though there be an injury, no action will lie. For a mere accident unmixed with negligence

or fault no action will lie even though an injury has been done, and no action will lie because there has been no breach of a duty that was owed and therefore no negligence. The case of *W. U. Tel. Co.* v. *State, use of Nelson,* 82 Md. 312, relied upon by the appellees is clearly distinguishable from this case. In that case the evidence showed that the telephone wire had been hanging over the feed wire for two weeks and the company had notice and an opportunity to mend it.

We do not deem it necessary to discuss the rejected prayers presented on the part of the appellant company, because we are all of the opinion for the errors indicated that the judgment appealed against must be reversed and as it is apparent that the appellees are not entitled to recover, a new trial will not be awarded.

*Judgment reversed with costs, without awarding a new trial.*

(Decided March 21st, 1905.)